## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEALMACHINE LLC.** | **Case No.** |
| **Plaintiff** | |
| **vs.** | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** | |
| **UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;** | |
| **UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, MARK KOUMANS, in his official capacity, ACTING DIRECTOR;** | |
| **CALIFORNIA SERVICE CENTER, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, KATHY BARAN, in her official capacity, DIRECTOR** | |
| **Defendants.** | |

## COMPLAINT FOR DECLARATORY RELIEF AND REVIEW OF AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURES ACT

## INTRODUCTION

1.  This action is brought pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, to seek judicial review and a declaratory judgment in the matter of the Defendants' improper denial of an H-1B petition filed by Plaintiff DealMachine LLC on behalf of Ms. Sowmya Reddy Kallu, whom it seeks to classify as a specialty occupation worker based on her offer of employment and position requirements of the company as a Full Stack Developer.

## JURISDICTION

2.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this is a civil action against the United States arising under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* and the Administrative Procedures Act, 5 U.S.C., § 701 *et seq.*, both laws of the United States.

3.   The APA also provides for a waiver of the United States' sovereign immunity in this matter pursuant to 5 U.S.C. § 702.

4.   Additionally, the Court retains jurisdiction to consider this issue since it involves a question of statutory eligibility for a benefit under the INA and does not involve a discretionary decision set forth at 8 U.S.C. § 1252(a)(2)(B)(ii).

## VENUE

5.   Pursuant to 28 U.S.C. § 1391(e), venue is proper in this district because this is a civil action in which the Defendants are employees or officers of the United States, acting in their official capacity, and an agency of the United States.

## PARTIES

6.   The Plaintiff, DealMachine LLC ("DealMachine"), was established in Buffalo, Wyoming on May 17, 2017. DealMachine helps real estate investors find more deals with its software, DealMachine, and provides property owner contact information, sends direct mail, and provides lead management.

7.   Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government responsible for, among other duties, administering and enforcing the INA.

8.   Defendant United States Citizenship and Immigration Services ("USCIS") is an agency within the U.S. Department of Homeland Security with its principal office in Washington D.C.

Congress has delegated authority for adjudicating immigration benefits applications filed pursuant to the Immigration and Nationality Act ("INA") and for implementing law and policy with respect to such benefits applications to the USCIS. The actions which are the subject of this lawsuit were taken by USCIS through its California Service Center in Laguna Niguel, California.

9.   Defendant Mark Koumans is the Acting Director of USCIS and is sued in his official capacity.

10. Defendant Kathy Baran is the Director of the California Service Center of the United States Citizenship and Immigration Services (USCIS) and is sued in her official capacity. During the period in question, USCIS delegated authority for adjudicating H-1B classification petitions filed by employers headquartered in Illinois to the California Service Center.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Although 8 C.F.R. § 214.2(h)(10)(ii) provides that denial of a petition for classification under Section 101(a)(15)(H) of the INA may be appealed to the Administrative Appeals Office under 8 C.F.R. § 10, neither the INA nor the implementing regulations require such appeal as a prerequisite for judicial review. Therefore, taking such appeal is not a prerequisite to judicial review of this matter pursuant to the APA. *See Darby v Cisneros*, 509 U.S. 137, 153-54 (1993); *see also Ore v. Clinton*, 675 F. Supp. 2d 217, 223-24 (D. Mass. 2009) (USCIS agreed in a cross-motion on an H-1B denial that exhaustion was not required), *EG Enters v. DHS*, 467 F. Supp. 2d 728, 732-33 (E.D. Mich. 2006) (the Court held that plaintiffs did not need to pursue an AAO appeal before seeking judicial review of a denied visa application in federal court).

## ISSUES PRESENTED

12. Whether the professional position of Full Stack Developer that DealMachine offered to Ms. Sowmya Reddy Kallu ("Ms. Kallu") is a specialty occupation pursuant to INA § 214(i)(1) and

its implementing regulations at 8 C.F.R. § 214.2(h)(4)(iii)(A), and therefore eligible for "H-1B"

classification pursuant to 8 U.S.C. § 1101(a)(15)(H)(i)(B).

13. Whether the Defendants' finding that this position is not a specialty occupation is arbitrary,

capricious, or an abuse of discretion based on the extensive evidence and therefore violates the

Administrative Procedures Act.

## FACTUAL ALLEGATIONS

14. Ms. Kallu is an Indian citizen holding a Bachelor of Science degree with a major in

Computer Science from Jawaharlal Nehru Technological University and a Master of Science

degree in Computer Science from the University of Central Missouri.

15. On December 28, 2015, Ms. Kallu entered the United States on an F-1 student visa to enroll

at the University of Central Missouri.

16. On August 15, 2018, DealMachine hired Ms. Kallu in the full-time professional role of

Full Stack Developer during her Optional Practical Training period, also known as OPT. On June

29, 2018, Ms. Kallu extended her OPT work authorization for 2 years based upon the Science,

Technology, Engineering or Mathematics, or "STEM" extension.

17. On April 1, 2018, DealMachine filed a petition to extend Ms. Kallu's employment beyond

the expiration of her OPT period in the annual "H-1B visa lottery" and sought to change her F-1

status to that of an H-1B specialty occupation worker pursuant to 8 U.S.C. § 1101(a)(15)(H)(i)(B).

(**Exhibit A**)  DealMachine classified the position using the DOL's standard occupational

classification ("SOC") system under code 15-1131, Computer Programmers. DealMachine also

described the professional job duties of this position as follows:

- (10%) Develop new user-facing features using React and React Native;

- (40%) Build reasonable components and front-end libraries for future use;

- (40%) Optimize components, APRs, and Databases for maximum performance across a vast array of web-based devices, browsers, and native platforms; and

- (10%) Collaborate with clients to promote usability best practices.

18. DealMachine initially identified its degree requirement as at least a Bachelor's degree in Computer Programming or a closely related field. Deal Machine also listed a requirement of proficient understanding of database structure and performance, web markup including HTML, CCS, JavaScript, React and React Native.

19. On April 17, 2019, Defendants issued Receipt Number "WAC1917351458" to reflect receipt of the Petition and the required fees which was also evidence of selection in the FY2020 H-1B visa lottery of the H-1B CAP numbers (65,000 regular with a 20,000 U.S. Masters exemption).

20. On May 22, 2019, Defendants issued a Request for Evidence ("RFE") seeking additional evidence.  The RFE requested evidence to prove that: 1) a valid employer-employee relationship for the duration of the requested validity period would exist, and 2) the position is a specialty occupation pursuant to 8 C.F.R. § 214.2(h)(4)(iii)(A) [setting forth that one of four criteria must be satisfied for a position to be a specialty occupation]. (**Exhibit B**)

21. On August 16, 2019, DealMachine responded to the RFE with extensive evidence demonstrating the nexus between Ms. Kallu's specialized education in Computer Science and the duties of the employer's professional position of a Full Stack Developer. (**Exhibit C**) In response to the RFE, DealMachine described the position's duties, the required education and skills, and the approximate percentage of time Ms. Kallu would spend on each task in greater detail.  In addition, this chart provided specific information on the higher education coursework required to

perform each task.  The duties and information [contained in Exhibit 2B of the legal response to the RFE] were described as follows:

| Primary Accountabilities and Complexity of Duties | Specific day-to-day tasks | % of time spent "Primary Accountability" | Higher Education Coursework Related to Proffered Position (see transcript) |
|---|---|---|---|
| Interact and advise with CTO on updates to the website/ app with new features, front end libraries and SQL query design for performance and reliability | • Communicates with CTO.<br>• With understanding of the company's IT systems, analyze, review and investigate system design options.<br>• Review the application updates as per latest technologies(For example, the company recently reviewed and updated to the latest versions) | 80% | **DATABASE MANAGEMENT SYSTEMS, DATABASE MANAGEMENT SYSTEMS LAB, Database Theory & Apps, Advanced Database Systems** |
| Optimizing end points, APIS's for maximum performance on all devices. | • Understand complex code to implement API's (For example, developing an understanding of how to write and use API's)<br>• Analyze and evaluate potential IT systems solutions and perform on all devices<br>• Maintain good performance of the application on all devices. | 80% | **Advanced Software Engineering** |
| Analyze, create and review detailed business requirements | • Understand business requirements.<br>• Analyze the needs of the clients and review them,<br>• Provide IT technical design specifications for specific modules. These specifications include details based on the IT system to be used and Develop, generate code to implement these specifications. | 90% | **Software Engineering, Software Testing, Advanced Software Engineering, Compiler Design and Construction** |

| | | | |
|---|---|---|---|
| Coordinate and liaison technical needs of application with the CTO to identify, develop, implement, test, and deploy to the system | • Position will primarily engage to develop the code. Implement in such way that it doesn't break the existing application.<br>• After developing the appropriate code they will also test the code and deploy it to the system.<br>• Do teamwork on IT technical solutions, overseeing technical changes (aligning with system's integrity); work with CTO to explain how the system will work to support the application.<br>• Ensure systems integrity and security are maintained, largely through business discussions outlined above,<br>• Coordinate resources for the system. This role coordinates all such Software and business technical activities, and transitions to software resources for any issues. | 90% | **Software Engineering, Software Testing, Advanced Software Engineering, Compiler Design and Construction** |
| Coordinate and liaison technical needs with CTO to ensure optimal delivery of the product. | • Monitor impact of changes to current business process. For example, recent changes are made to the system with new features.<br>• Ensure all IT upstream and downstream impacts are identified and addressed. For example, this process involved creating a product as per the user needs. Software development Life Cycle was essential to review the proposed flow of the application. All steps are performed effectively to deliver the product as per the requirement.<br>• Manage timing of IT changes to avoid conflicts with month-end, year-end, upgrades, and project schedules | 80% | **Software Engineering, Software Testing, Advanced Software Engineering, Compiler Design and Construction** |

| | | | |
|---|---|---|---|
| Creating awesome experiences for our users by developing interface and back-end components to implement them. | • Implement awesome features in accordance with global template. The new updates are made in such a way that it amazes the users with latest appearance. The person in this role will first develop awesome experience for the users, implement interfaces and back-end components, analyze and review the changes to understand impact of the new features, global processes and any legion impacting providing their approval and testing of the change. | 100% | **Software Engineering, Software Testing, Advanced Software Engineering** |
| Creating new features using React, React Native and ensure the system is robust, easy to maintain | • New features are added to the system using the latest technologies like React and React Native, PHP.<br>• New Components are added to the application depending on the requirements of the customers.<br>• The system is designed in such a way that even up on adding the new features it should be robust and run on multiple platforms. It should be maintainable.<br>• Understand testing required to ensure integrity of Global template. The testing component of the role is to document standard processes, including automate test scripts to verify changes to be made in Production system.<br>• Testing is also done to see if system change works as requested/designed along with regression testing to ensure no unexpected impact to other processes, especially a global process | 100% | **Software Engineering, Software Testing, Advanced Software Engineering** |

| | | | |
|---|---|---|---|
| Building reusable components, front-end libraries for future use and communicate with the customers to resolve the issues, troubleshoot them on the application | • The person in this role will build the Components in such a way that they are reusable even in the future so that the code written is not wasted. Hence we can save our time instead of creating it from the scratch.<br>• The front-end libraries and API's are also stored and reused for the future so that there is no need to write the same code again and again.<br>• In order to resolve the issues in the system it is always a best scenario to communicate with the users and fix the issues.<br>• This person will also troubleshoot the application and resolve the issues in the timely manner. | 80% | **Software Engineering, Software Testing, Advanced Software Engineering** |
| Perform testing for new production releases or upgrades to system. | • Ensure that as every new feature is added it is good practice to perform different phases of testing so that it doesn't fails in the production.<br>• Up on each and every update we need to test the system comparing the actual behavior and expected behavior<br>• The person in this role will take the responsibility to check the application before pushing it to the production. | 90% | **Software Engineering, Software Testing, Advanced Software Engineering** |

| | | | |
|---|---|---|---|
| Participate in project Management Successfully, Evaluate processes, functionality to ensure disciplined, accurate use of system and documentation of code. | • Understand the overall application and excellent functionality is ensured by this person.<br>• Involve in all the areas of the project and manage the project in the disciplined manner with appropriate use of the system. Drive design of new functionality adheres / enhances overall system experience. As new functionality is introduced conforms to usage of the global template or if adding, aligns/improves processes.<br>• Review/approve technical and program changes to system in accordance with global template and project requirements. Peer review of code to ensure no hardcoding in program, no change made not approved as part of the solution, and documentation in place.<br>• Test project solution prior to implementation. Same as testing with the global template - positive testing of the project work and regression testing to ensure no./minimal impact to current system<br>• Participate with project cutover/go lives. Projects cutovers/go lives may impact Production system with outages, performance issues, new functionality. The person in this role helps coordinate and/or perform system updates as needed to support go lives.<br>• The person will also take care of all the phases in the Software development like requirement gathering, Analyze, Design, Develop, Test and Deployment to the System. | 100% | **Advanced Database Systems, Software Testing, Advanced Software Engineering, Compiler Design and Construction.** |

| | | | |
|---|---|---|---|
| | • Communicates with CTO in timely manner.<br>• Support project solution post go live, incorporate into global template. Once a project goes Live, anything implemented is now part of on-going support and included in all the above reviews, testings, approvals, deployments, changes, documentation, etc. | | |

22. DealMachine also elaborated upon its hiring requirements for the professional position of Full Stack Developer, and confirmed that the minimum educational requirement for the position is a Bachelor's degree in Computer Science, Computer Information Systems, or a closely related field. DealMachine also described the coursework and skills Ms. Kallu completed and acquired during her Bachelor's and Master's programs qualifying her for this position and explained why such an educational background was necessary to fill this position.

23. Pursuant to 8 C.F.R. § 214.2(h)(4)(iii)(D)(1), DealMachine also included an expert letter from Dr. Marco Aurelio Gerosa, an Associate Professor in the School of Informatics, Computing, and Cyber Systems at Northern Arizona University attesting to the minimum degree required to perform the responsibilities of the Full Stack Developer position at DealMachine. After a careful assessment, Mr. Gerosa concluded that only the minimum of a bachelor's degree in Computer Science, Computer Information Systems, or a related field of study could provide a prospective employee with the core competencies and skills needed for a Full Stack Developer position at DealMachine. Mr. Gerosa's professional evaluation was based not only upon his examination of the job description but also upon review of DealMachine's business operations and Ms. Kallu degrees and transcripts, and his expertise as a professional and expert in the field of software engineering, information systems, databases, data analysis, and business analytics.

24. Mr. Gerosa explained the nexus between Ms. Kallu's education and the skills required for this role; specifically, he found that Ms. Kallu's coursework at University of Central Missouri in her Master's program and at Jawaharlal Nehru Technological University in her Bachelor's program involved the extensive study of a number of highly sophisticated technical concepts such as optimization of computer systems, code review, and database systems that are the theoretical foundation for tasks performed by the Full Stack Developer at DealMachine.

25. DealMachine also enclosed company job postings for the same or parallel positions. The job postings all listed a requirement of a Bachelor's degree in Computer Science, Information Technology, or a related field.  Defendants took issue with these job postings and concluded that the positions did not require the theoretical and practical application of a body of highly specialized knowledge and therefore did not require a bachelor's degree in a specific specialty without further explanation of why the job postings did not meet the burden of proving that DealMachine normally requires a degree or its equivalent for the position.

26. DealMachine also included a memo on Level 1 Wage drafted by the attorney of record that explained that: (1) USCIS is legally directed only to "determine if the [labor condition] application involves a specialty occupation as defined in [INA §214(i)(l)]" and to determine whether the alien qualifies to perform the services as described in the specialty occupation; (2) that USCIS is misapplying the DOL guidance for the wage level system to determine if a particular level equates to a specialty occupation; (3) some positions are inherently specialty occupations regardless of the wage level; and (4) that it is outside the scope of USCIS' adjudicatory function to make wage determinations.

27. On September 3, 2019, Defendants denied this petition on the grounds that the position offered to Ms. Kallu was not a specialty occupation. Specifically, Defendants found that

12

DealMachine failed to establish that its professional position of Full Stack Developer met any of the four criteria enumerated under 8 C.F.R. § 214.2(h)(4)(iii)(A). Defendants' decision included multiple misstatements or failures to consider pertinent evidence that DealMachine submitted. For example, Defendants stated that a wage level 1 certification does not support an argument that the position is so complex, even though USCIS does not have the authority to use a particular wage level to disqualify the position as a specialty occupation even though the weight of the evidence related to the position clearly satisfies at least one of the regulatory criteria.  (**Exhibit D**)

28. On June 28, 2020, Ms. Kallu's STEM OPT work authorization will expire. Upon its expiration, she will have no basis for continuing work authorization in the United States absent intervention by this federal court and approval of the subject H-1B petition and DealMachine will no longer be able to legally employ her.

## CAUSE OF ACTION

## COUNT I – APA VIOLATION (5 U.S.C. § 706)

29. Exercising judicial review pursuant to 5 U.S.C. § 706, the Court should find that Defendants' decision on DealMachine's petition is arbitrary, capricious, an abuse of discretion, or not in accordance with the law because it is inconsistent with the statutory, regulatory, and judicial authority summarized below.

30. Defendants are bound to follow statutory and regulatory guidance applicable to the H-1B program. Specifically, Defendants are bound to follow the statutory definition of a "specialty occupation" set forth at 8 U.S.C. § 1184(i)(1), which defines a specialty occupation as one that requires:

          i.    The theoretical and practical application of a body of highly specialized knowledge, and

ii.   Attainment of a bachelor's or higher degree in the specific specialty (*or its equivalent*) as a minimum for entry into the occupation in the United States. (emphasis added)

31. Defendants are also bound by the statutory guidance set forth at 8 U.S.C. § 1184(i)(2) on the requirements for H-1B classification, and the regulations at 8 C.F.R. § 214.2(h)(4)(iii)(A), which provide four alternative prongs for classification as a "specialty occupation." Pursuant to 8 C.F.R. § 214.2(h)(4)(iii)(A), to qualify as a specialty occupation, the position must meet <u>any one</u> of the following four criteria:

1)   A baccalaureate or higher degree or its equivalent is normally the minimum requirement for entry into the particular position;

2)   The degree requirement is common to the industry in parallel positions among similar organizations or, in the alternative, an employer may show that its particular position is so complex or unique that it can be performed only by an individual with a degree;

3)   The employer normally requires a degree or its equivalent for the position; **or**

4)   The nature of the specific duties are so specialized and complex that knowledge required to perform the duties is usually associated with the attainment of a baccalaureate or higher degree.

32. Pursuant to 8 C.F.R. § 214.2(h)(4)(iii)(A), DealMachine was only required to satisfy one of the four above prongs.  DealMachine submitted an abundance of evidence to satisfy each of these four prongs. Nonetheless, Defendants rejected all four alternative possible bases without meaningful or thorough consideration of the Plaintiff's evidence.

14

33. Defendants' disregard of the substantial evidence presented by DealMachine demonstrates Defendants' unwillingness to adhere to the preponderance of the evidence standard of proof applicable to visa petition proceedings. *Matter of Martinez*, 21 I&N Dec. 1035, 1036 (BIA 1997) (noting that in visa petition proceedings, the petitioner must prove by a preponderance of evidence that the beneficiary is fully qualified for the benefit sought.) Pursuant to this standard, the petitioner need only show that his or her claim is "probably true." *Matter of E-M-*, 20 I&N Dec. 77, 79-80 (Comm'r 1989). Even if the director has some doubts as to the truth, if the petitioner submits relevant, probative, and credible evidence that leads the director to believe that the claim is "probably true" or "more likely than not," the applicant or petitioner has satisfied the standard of proof. *Matter of Chawathe*, 25 I&N Dec. 369, 376 (AA 2010) quoting *INS v. Cardozo-Fonseca*, 480 U.S. 421 (1987) (defining "more likely than not" as a greater than 50 percent probability of something occurring).

34. Defendants acted arbitrarily and capriciously in finding that the employer had failed to provide evidence that a Bachelor's or higher degree or its equivalent is normally the minimum requirement for entry in the role of a Full Stack Developer at DealMachine. Defendants failed to take note that according to the O*NET, a Department of Labor publication, a bachelor's degree is normally required in 89% of cases reported with only 3% reporting having only some college/no degree. Defendants purposefully ignored this evidence of industry standards to support the improper determination that a bachelor's degree, or its equivalent, is not normally the minimum requirement for the position and the degree requirement is not common to the industry under the first and second criteria of 8 C.F.R. §214.2(h)(4)(iii)(A). If 89% of employers require a bachelor's degree for the position of Full Stack Developer, it follows that such a degree is "normally" required for the position, which is sufficient to meet the statutory definition of the first criterion for an H-

1B specialty occupation. *Next Generation Tech., Inc. v. Johnson*, No. 15 cv 5663 (DF), 2017 U.S.

Dist. LEXIS 165531, at *30-31 (S.D.N.Y. Sep. 29, 2017) (finding an illogical conclusion between

Defendants' determination that "computer programmers are not normally required to have a

bachelor's degree" and evidence indicating that "most computer programmers have a bachelor's

degree,." The court thereby held that the occupation of "computer programmer," as is the case

here, is considered a specialty occupation.) Proper consideration of the OOH demonstrates that the

position of Full Stack Developer for DealMachine qualifies as a specialty occupation.

35. Further, "the clearest common denominator for professional standing is at least a

baccalaureate awarded for academic study in a specific discipline or narrow range of disciplines.

This requirement is explained in numerous Immigration and Naturalization Service precedent

decisions dating back to 1966. E.G., *Matter of Portugues Do Atlantico Information Bureau, Inc.,*

19 I&N Dec. 194 (Comm. 1984); *Matter of Ahmed*, 12 I&N Dec. 498 (R.C. 1967); *Matter of*

*Palanky*, 12 I&N Dec. 66 (R.C. 1966); *Matter of Shin*, 11 I&N Dec. 686 (D.D. 1966). Matter of

Caron International, Inc., 19 I&N Dec. 793 (AAO 1988).

36. Defendants' erred in finding that the record contained a generic job description and that

DealMachine had not shown that the professional position of Full Stack Developer involves duties

seen as either unique or complex so that only an individual with a bachelor's degree or higher in a

specialty occupation could perform them. DealMachine provided in its original employer letter a

detailed breakdown of Ms. Kallu's specialized job duties with percentages. DealMachine further

elaborated on the job duties in the RFE response and provided an extremely detailed breakdown

of the job duties as restated herein. DealMachine demonstrated the nexus between the required

education and these tasks. Defendants' disregard of the clear and vast evidence in the record and

its failure to articulate a rational connection between the record and its decision is arbitrary and

capricious. *See Residential Finance Corporation v. USCIS*, 839 F. Supp. 2d 985, 996-97 (S.D. Ohio 2012).

37. Defendants erred in concluding that the wage level 1 certification does not support an argument that the position is complex. Defendants used the wage level 1 certification to argue that the LCA did not support DealMachine's stance that the proffered position is more complex or so unique that only an individual with a bachelor's degree or higher in a specific specialty can qualify for it. By making this illogical conclusion, Defendants are wrongly re-adjudicating the determination of another government agency. The Department of Labor ("DOL") is responsible for determining the wage level for a particular position based on DOL guidance in the prevailing wage and PERM labor certification context. Defendants' responsibility is to determine whether the attestations and content of an LCA correspond to and support the H-1B visa petition, including the specific place of employment. 20 C.F.R. § 655.705(b)(2014). See also 20 C.F.R. §705(b). The wage determination by the DOL is primarily focused on the requirements for the position rather than the complexity of the duties. In *Matter of P-D-S,* cited in Next Generation as support of whether a wage level one negates the classification of a specialty occupation, the AAO found that "it is important to note that a Level I wage-designation does not preclude a proffered position from classification as a specialty occupation. In certain occupations (doctors or lawyers, for example), such a position would still require a minimum of a bachelor's degree in a specific specialty, or its equivalent, for entry. Similarly, however, a Level IV wage-designation would not reflect that an occupation qualifies as a specialty occupation if that higher-level position does not have an entry requirement of at least a bachelor's degree in a specific specialty or its equivalent. That is, a position's wage level designation may be a consideration but is not a substitute for a determination

of whether a proffered position meets the requirements of section 214(i)(1) of the Act." *Matter of P-D-S-*, ID# 283927 (AAO July 31, 2017).

38. To satisfy the fourth prong, DealMachine submitted an expert opinion letter from Dr. Marco Aurelio Gerosa, Associate Professor at Northern Arizona University's School of Informatics, Computing, and Cyber Systems. Dr. Gerosa provided an extensive analysis of Ms. Kallu's job duties and the required educational background. Defendants' concluded that Dr. Geresa's letter would carry no weight because he did not demonstrate or assert in-depth knowledge of the position, DealMachine's business operations, and how the duties of the position would actually be performed in the context of DealMachine's business. The denial states, "*The professor does not demonstrate or assert in-depth knowledge of your business operations or how the duties of the position would actually be performed in the context of your business.*"

This is contrary to what Dr. Gerosa's letter explicitly states. Dr. Gerosa gave a detailed explanation of his understanding of DealMachine's operations and explained in greater detail the nexus between the position's specific duties, the specific work tasks described for the position by O*NET, and Ms. Kallu's coursework during her Bachelor's and Master's programs.

Defendants had no legitimate reason in refusing to consider Dr. Gerosa's expert opinion letter and failed to use its own guidance in evaluating Dr. Gerosa's statement. The Adjudicator's Field Manual instructs adjudicators "*if you decide that the statement or testimony of a petitioner or applicant, or of any other witness, is not credible, your written decision should indicate this conclusion.*" See AFM Ch. 11.1(l) The AFM goes to further say that it is not enough to say that the witness is not credible and that the Defendants' have an obligation in their decision to "give the specific reason or reasons for their conclusion, and refer to the elements of the record that

support the conclusion." *Id.* Since Defendants' never took issue with Dr. Gerosa's credibility, it was wrong of Defendants' to completely ignore his expert opinion.

Defendants' rejection of an expert opinion is suspect where it has clearly failed to review the opinion. *See Matter of Caron Int'l, Inc.,* 19 I&N Dec. 791, 795 (Comm'r 1988). Further, where an expert's credentials are clearly established and there is no reason to doubt the veracity of his testimony, it should be accorded deference and given consideration pursuant to 8 C.F.R § 214.2(h)(4)(iii)(A)(4). *See*, *e.g.*, *Matter of Skirball Cultural Center*, 25 I&N Dec. 799 (AAO 2012) (finding that where there is no issue with experts' credentials or knowledge of subject, and no reason to doubt the veracity of the testimony, the expert testimony is found reliable, relevant, and probative as to the specific facts in issue). See also *Fred 26 Importers v. U.S. Dept. of Homeland Sec.,* 445 F.Supp.2d. 1174 (2006) (finding that the AAO abused its discretion when it did not address the statements in expert letter and simply held that the record did not establish that the position met the fourth criterion).

39. Defendants' decision demonstrates misinterpretation or disregard of evidence in the record. Defendants failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Defendants failed to provide a meaningful or rational explanation for deviating from prior practices or to consider the sufficiency of the evidence of record under 8 C.F.R. § 214.2(h)(4)(iii)(A), resulting in a decision that was arbitrary, capricious, and an abuse of discretion under the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, in view of the arguments and authority noted herein, DealMachine LLC respectfully prays that this Court grant the following relief:

1. Declare that the Defendants' denial of Ms. Kallu's H-1B petition is unlawful;

2. Vacate the decision of USCIS dated September 3, 2019, denying DealMachine's petition to classify Ms. Kallu as an H-1B nonimmigrant under 8 U.S.C. § 1101(a)(15)(H)(i)(B) on the grounds that the denial is arbitrary, capricious, an abuse of discretion, and not in accordance with the law;

3. Order Defendants to grant the petition and Ms. Kallu's request for change of nonimmigrant status;

4. Grant reasonable attorney's fees and costs as provided under the Equal Access to Justice Act (EAJA) and the APA; and

5. Grant such other relief at law and in equity as justice may require.

Respectfully submitted,

By: s/Meena Sinfelt
    s/Maria de las Mercedes Badia-Tavas*
    s/Mayra Bruno*

* Moving for *pro hac vice* admission

Attorneys for Plaintiff

Maria de las Mercedes Badia-Tavas
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 214-8313
Dated: November 13, 2019

Meena Sinfelt
Barnes & Thornburg LLP
1717 Pennsylvania Ave NW
Suite 500
Washington D.C. 20006

(202) 371-6368
Dated: November 13, 2019

Mayra Bruno
Barnes & Thornburg LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606
(312) 214-4575
Dated: November 13, 2019